**James A. HALL, IV, by his Guardian Ad Litem, James A. HALL, III; James A. Hall, III and Frances A. Hall, Appellees,**

v.

**The VANCE COUNTY BOARD OF EDUCATION; North Carolina State Board of Education and A. Craig Phillips, North Carolina Superintendent of Public Instruction, Appellants.**

No. 84–1013.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 3, 1984.

Decided Oct. 10, 1985.

Paul J. Stainback, Henderson, N.C., Elizabeth C. Bunting, Raleigh, N.C. (Rufus L. Edmisten, Kaye R. Webb, Asst. Atty. Gen., Raleigh, N.C., on brief), for appellants.

M. Keith Kapp, Raleigh, N.C. (W.W. Taylor, Jr., Maupin, Taylor & Ellis, P.A., Raleigh, N.C., on brief), for appellees.

Before WINTER, Chief Judge, WILKINSON, Circuit Judge, and BUTZNER, Senior Circuit Judge.

HARRISON L. WINTER, Chief Judge:

Defendants, Vance County Board of Education, the North Carolina Board of Education, and A. Craig Phillips, Superintendent of the North Carolina Department of Public Instruction, appeal from a decision of the district court that they had failed to provide James Hall, IV, with a free appropriate public education (FAPE) prior to January 1982, as required by the Education for All Handicapped Children Act (EAHCA), 20 U.S.C. §§ 1400–1420 and the parallel North Carolina statute, N.C.G.S. §§ 115C–106 to –116. The district court awarded plaintiffs, James and his parents, reimbursement for costs incurred by them in educating James. It also ordered the County Board of Education to pay James' tuition and fees at Oakland School, a private school, for the 1983–84 school year. Defendants appeal from both the finding that they denied James a FAPE and from the relief granted to plaintiffs.

We stayed decision in this case after oral argument pending Supreme Court review of *Town of Burlington v. Department of Education for the Commonwealth of Massachusetts,* 736 F.2d 773 (1 Cir.1984), a case involving some of the same issues presented by this case. After the Supreme Court announced its decision, *Burlington School Committee of the Town of Burlington v. Department of Education of the Commonwealth of Massachusetts,* —— U.S. ——, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), we requested plaintiffs and defendants to submit supplemental memoranda addressing the Supreme Court's decision. In the light of that decision and of the parties' supplemental arguments, we affirm.

I.

James A. Hall, IV, is a bright sixteen year-old boy of above average intelligence. Yet at age eleven, as he prepared to enter the fifth grade in the Vance County, North Carolina, public schools, he was functionally illiterate, unable to distinguish between the words "ladies" and "gentlemen" on restroom doors, or to go to the store to make small purchases for his mother. James suffers from dyslexia, a severe learning disability that hinders his ability to decipher written symbols. Although

there is no cure for dyslexia, a dyslexic child can learn methods of unscrambling words that will enable him to read.

James' parents have lived in Vance County, North Carolina since May of 1974. In the fall of that year he began kindergarten in the Vance County public schools. He progressed through kindergarten and first grade, and was promoted to second grade for the 1976–77 school year. During that year the Halls became increasingly aware of James' reading problems and requested that he be evaluated by the school psychologist. Dr. A.B. Laspina conducted this evaluation in May of 1977. His tests revealed that James had a high IQ, but that his reading level was more than a year behind his grade level. The tests did not indicate a perceptual basis for James' problems. Dr. Laspina recommended further evaluation by the school's learning disabilities teacher, reading remediation and special help, and part-time learning disability class placement. He also recommended that the parents employ a private tutor. The Vance County School Board and the school took none of the steps recommended by Dr. Laspina. Instead, the school merely endorsed his recommendation that the Halls employ, at their own expense, a tutor for James. The tutor worked with James from July 1977 to April 1979.

James did not successfully complete the second grade. He received six failing grades and a "D" for the 1976–77 school year, and he repeated the second grade during the 1977–78 school year. That year his grades were improved, although they revealed continued weakness in reading.

James entered the third grade in the Fall of 1978. His third-grade teacher recognized that he had learning difficulties and recommended further evaluation, to which the Halls consented. An evaluation committee met and identified James as learning disabled. They also drafted an "individualized educational program" ("IEP") to cover the second half of the 1978–79 school year (James' third grade) and all of the 1979–80 school year. The IEP called for James' placement in a regular classroom ninety-five percent of the time, and his placement in a learning disabilities resource room with other learning disabled students the remainder of the time. Apparently the school implemented the IEP by having James attend resource room twice a week for thirty-minute periods during the remainder of his third grade, and by increasing the number of sessions to four a week in fourth grade. In January 1979 the school system's placement committee approved the recommended IEP, and Mrs. Hall signed a consent form to James' placement. The parties dispute what notice the school gave the Halls of their substantive and procedural rights during the period December 1978 to January 1979. That issue is discussed below. There is no dispute, however, that the school failed to give such notice at any other time.

Despite institution of the IEP, James continued to receive poor grades, including a failing grade in reading in third grade. He was promoted to the fourth grade, apparently because of a school policy against having a child repeat two grades in succession. James did not improve much in the fourth grade. Moreover, a battery of tests administered to James in December of 1978, before institution of the IEP, and again in May of 1980, after three semesters of the IEP, indicated little overall improvement. Most notably, he still tested at the second grade level for reading, and his reading recognition score had not improved at all. His test scores on other standardized tests given in 1979 and 1980 similarly indicated substantial learning problems. His performance on the California Achievement Test, taken in April of 1980, showed him scoring in the lowest two percent of the nation's fourth-grade students in reading comprehension and the lowest four percent in "total mathematics."

Despite this lack of progress, the school proposed to promote James to the fifth grade and to continue for the 1980–81 school substantially the same IEP as the one that had to date not helped him. The new IEP again called for James to spend ninety-five percent of his time in a regular

class and the remaining time, four thirty-minute periods a week, in a special education resource room. In desperation, the Halls decided to enroll James in a local private school, Vance Academy, for the 1980–81 school year. Because Vance Academy was not equipped to teach learning disabled children, James was unable to keep up. He left the school within two months of enrolling.

On the academy's recommendation, the Halls sought a private evaluation of James. In September 1980, the Halls had James tested by Sharon Fox White who diagnosed him as dyslexic. She later stated that in her nine years of experience with learning disabled children she had "seen very few with James' impressive ability and *extremely* poor achievement." A second private evaluation, conducted by Dr. John A. Gorman, confirmed the diagnosis. Dr. Gorman found that James was functionally illiterate and that his reading comprehension was untestable. He also found that James' repeated failure at school had resulted in emotional harm and that he had begun to develop a "school phobia." He recommended residential placement for James, and suggested a number of schools including Oakland School in Boyds Tavern, Virginia. The Halls chose Oakland because it was the closest residential school that accepted learning disabled children. Because Oakland had no immediate openings, the Halls kept James at home and provided private tutoring from October 1980 until June 1981.

In April 1981, when the Halls first learned from someone at Oakland that they might be able to obtain public funding for James' education at a private school, they contacted a lawyer who suggested that they obtain Vance County Board of Education approval for his placement at Oakland. Beginning in May the Halls made repeated efforts to have the county schools approve the Oakland placement. The County School Board insisted, however,

that it could not initiate any procedures regarding placement and funding unless James was first re-enrolled in the Vance County schools. Only in November, after the Halls had turned to the State Board of Education and the State Board had informed the Vance County Board of Education that its position was legally untenable,[1] did the County Board relent on its precondition and agree to evaluate James in order to determine the appropriate precondition. James' evaluation occurred on December 15, 1981.

The December 1981 evaluation indicated that James had made considerable progress at Oakland. His reading recognition, reading comprehension, and spelling scores had all increased at least one grade level from when he was last tested. Based on this evaluation, the school proposed placement in the Vance County Schools and a new IEP that called for most of James' time to be spent in specialized instruction classes. The Halls opposed this proposal. On January 22, 1982, the case was heard before a local hearing examiner who found the IEP inadequate and in need of modification, but who also found placement in the Vance County public schools appropriate. Upon further administrative review, the State Hearing Review Officer similarly held that the placement was appropriate though the IEP was not. He also held that the Vance County schools had not provided James a FAPE before January 1982, but he stated that he had no authority to award reimbursement for tuition and other costs. Following the decision of the State Hearing Review Officer, the Halls filed this action in the district court.

The district court ruled that the Vance County Board of Education had failed to provide James a FAPE, as required by federal and North Carolina law, at any time prior to January 1982. In addition, it ruled that because the School Board had egregiously violated the procedural requirements of the EAHCA, 20 U.S.C. § 1415,

---

1. North Carolina regulations provide for evaluation and placement of private school students without their enrollment in public school. N.C. Dept. of Public Instruction, Rules Governing Programs & Services for Children with Special Needs § .1527.

plaintiffs were entitled to reimbursement for the costs of providing James' education.[2] Finally, the district court held that the Board of Education would not be able to give James a FAPE during the 1983–84 school year and must pay the costs of James' schooling at Oakland School for that year.

## II.

■ The EAHCA permits "any party aggrieved" to bring a civil action to enforce the rights created by the Act. 20 U.S.C. § 1415(e)(2). The Act gives state courts of competent jurisdiction and federal district courts the power to "grant such relief as the court determines is appropriate." *Id.* Defendants argue on appeal that the "appropriate relief" provided for in the Act is limited to injunctive relief and does not include reimbursement. In addition, defendants, relying on this court's earlier decision in *Stemple v. Board of Education,* 623 F.2d 893 (4 Cir.1980), *cert. denied,* 450 U.S. 911, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981), contend that even if the Act creates a private reimbursement remedy, plaintiffs

had waived any right to reimbursement by unilaterally placing James in a private school in violation of section 615(e)(3) of the Act. 20 U.S.C. § 1415(e)(3). We believe that the Supreme Court's *Burlington* decision disposes of both of these arguments adversely to defendants' position.

In *Burlington* the Court settled the issue of the availability of a reimbursement remedy by stating, "we are confident that by empowering the court to grant 'appropriate' relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case." —— U.S. at ——, 105 S.Ct. at 2003.[3] The Court next disposed of the argument that unilateral placement bars a reimbursement remedy. The Court stated: "We do not agree with the Town that a parental violation of § 1415(e)(3) constitutes a waiver of reimbursement." *Id.* at ——, 105 S.Ct. at 2004. Our contrary rule in *Stemple* is superseded by *Burlington,* and we therefore reject defendants' argument that plaintiffs' recovery is barred by their unilateral placement of James in the Oakland School.[4]

2. The judgment directed the County Board of Education, alone, to reimburse plaintiffs for the costs of: tutoring James while he was enrolled in the public schools; Oakland School tuition prior to the 1983–84 school year; one private educational evaluation; and interest paid on tuition loans. Under North Carolina law the Board may seek contribution from the North Carolina Board of Education. N.C.G.S. § 115c-115(3).

3. The Act permits a reimbursement remedy, but it does not create a private cause of action for damages for educational malpractice. *See, e.g., Anderson v. Thompson,* 658 F.2d 1205, 1211–13 (7 Cir.1981). Defendants argue that we should remand for a determination by the district court of what part of its award constitutes damages and what part reimbursement. In *Burlington,* the Supreme Court drew the following distinction between the two remedies: "In this Court, the Town repeatedly characterizes reimbursement as 'damages' but that simply is not the case. Reimbursement merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." —— U.S. at ——, 105 S.Ct. at 2003. This description also accurately describes the district court's judgment in the instant case. There is no need for a remand in this case since the district court's award only contains reimbursement for

costs defendants were obliged to pay in the first instance (and interest incurred by plaintiffs due to defendants' failure to pay) and not damages.

4. Defendants would have us limit the Supreme Court's ruling on unilateral placement to those situations where the placement occurred during the pendency of review proceedings. They argue that unilateral placement should bar plaintiffs' recovery, since plaintiffs had not initiated review of the school's IEP before removing James from the public schools. However, even were we to read *Burlington* as applying only to unilateral placements that occur during the pendency of review proceedings, we would still hold that the unilateral placement of James at Oakland School does not bar plaintiffs' reimbursement recovery. The Act imposes a duty on the school system to inform parents of the rights and procedures created by the Act. Both the State Hearing Review Officer and the district court found that the school had consistently failed to inform plaintiffs of these rights and procedures. Plaintiffs' failure to initiate proceedings was a direct result of the school's non-compliance with the procedural safeguards set out in the Act's section 615. 20 U.S.C. § 1415. Where failure to initiate review proceedings before changing a child's placement is the result of a school system's own failure to inform the parents of available avenues of review, the uni-

Defendants' contentions that the Act only permits injunctive relief or bars a reimbursement remedy where parents unilaterally change the child's placement have no force in light of *Burlington*. We turn now to defendants' remaining arguments that the district court erred in finding that the Vance county schools failed to provide James an appropriate education and that the appropriate placement for the 1983–84 school year was the Oakland School.

### III.

The district court, like the state hearing officer, found that the county schools had not offered James a FAPE before January 1982. In so finding, the court took pains to follow the guidelines of *Hendrick Hudson Central School District Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Following *Rowley*, it considered first whether the school system had complied with the EAHCA's requirements and second whether it had provided James with an education "reasonably calculated to enable him to receive educational benefits." *Id.* at 206–07, 102 S.Ct. at 3050–51. Defendants assert error both in the Court's findings of fact and in its application of the law. We do not find the arguments meritorious.

The *Rowley* Court emphasized the importance of the Act's provisions ensuring meaningful parental participation in formulating and implementing a child's IEP. That Court stated:

It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process … as it did upon the measurement of the resulting IEP against a substantive standard.

*Id.* at 205–06, 102 S.Ct. at 3050. *Rowley* recognizes that parental participation is an important means of ensuring state compli-

ance with the Act. Unless school systems apprise parents of their procedural protections, however, parental participation will rarely amount to anything more than parental acquiescence, because parents will presume they have no real say, and the participatory function envisioned by *Rowley* will go unfulfilled. In this case, the district court found consistent failure to comply with the Act's requirements (as well as the requirements imposed by North Carolina law), most notably in the school system's failure to notify the Halls of their rights. We conclude that the district court's factual finding is not clearly erroneous.

Section 615 of the Act, 20 U.S.C. § 1415(a), (e), sets out the procedural rights granted to parents. Among these rights are the right to examine all records relevant to the child's education and to the provision of a FAPE to the child, 20 U.S.C. § 1415(b)(1)(A), and the right to an independent educational evaluation of the child. *Id.* Section 615 also guarantees a right to an impartial due process hearing with administrative and judicial review to resolve disputes between parents and the school. *Id.* §§ 1415(b)(2), (c), (e)(2). Most important, section 615 requires advance written notice of all procedures available under the section whenever the state or local educational agency proposes to initiate or change a child's identification, evaluation, or educational program. *Id.* § 1415(b)(1)(C)–(D).

At trial defendants conceded, or left uncontroverted, many of plaintiffs' contentions regarding notification of their rights. As early as 1977 the school suggested that the Halls hire a tutor for James, but it never informed them of the possibility of public funding for that tutor. Similarly, after the Halls announced their intention to withdraw James from the public school, it failed to discuss with them the possibility of public funding for residential schooling and the appropriate procedures for place-

lateral placement of the child should not, in our view, be treated as a waiver of a reimbursement remedy. *Cf. Powell v. Defore*, 699 F.2d 1078,

1081 (11 Cir.1983); *Anderson v. Thompson*, 658 F.2d 1205, 1213–14 (7 Cir.1981).

ment. When James' second IEP was prepared, the school failed to inform the Halls of their procedural rights, despite its clear statutory obligation to do so.

In fact, the only instance where the school claims to have fulfilled its notice requirement is during the preparation and adoption of James' first IEP. At trial, one of the school's learning disabled teachers testified that she and the school psychologist explained to the Halls their procedural rights in December 1978, though she also stated that "[w]e didn't go into a lot of detail."[5] Mrs. Hall testified that she was told only that she could have James reevaluated and could change the IEP if she disagreed with it. She testified that she understood this to mean that the school would repeat the process and that she was not told that she had a right to an independent evaluation. Further, a state study of the Vance county schools' compliance with the federal and state procedural requirements showed that failure to notify parents of handicapped children of their rights was a common occurrence.

The State Hearing Review Officer concluded that the school "has consistently failed to inform the parents of their procedural rights and safeguards." The district court similarly found that the school failed to inform the Halls of their procedural rights until October 1981. The district court found that, in addition to ignoring these "fundamental procedures," defendants had, contrary to the mandate of *Rowley*, failed to develop an IEP which met the requirements of 20 U.S.C. § 1401(19).[6] *See Rowley*, 458 U.S. at 206 n. 27, 102 S.Ct. at 3051 n. 27. Thus, district court's findings are supported by substantial evidence and are not clearly erroneous.

■ Under *Rowley*, these failures to meet the Act's procedural requirements are adequate grounds by themselves for hold-

ing that the school failed to provide James a FAPE before January, 1982. The district court additionally found, however, that the school had failed to provide James with an education reasonably calculated to enable him to receive educational benefits. Defendants contend that the district court erred by disregarding *Rowley*'s rule that the EAHCA does not require schools to provide an education that will allow a handicapped child to fulfill his maximum potential. Nowhere, however, does the district court's opinion suggest that it held the defendants to that impermissible standard. Instead, it properly considered the evidence introduced at trial, including two independent evaluations and the results of several standardized tests, in determining that James' education was not reasonably calculated to enable him to receive educational benefits, as required by the Act and *Rowley*.

*Rowley* recognized that no single substantive standard can describe how much educational benefit is sufficient to satisfy the Act. Instead, the Supreme Court left that matter to the courts for case-by-case determination. In approaching this question, the district court adopted the *Rowley* court's strategy. It considered James' capabilities and intellectual progress and what the school had provided him. *Cf. Rowley*, 458 U.S. at 202–03, 102 S.Ct. at 3048–49.

■ Defendants contend, however, that James' academic progress, as measured by his grade promotions and test scores, evinces educational benefit and requires under *Rowley* that the district court's ruling be overturned. We disagree. Although the *Rowley* Court considered Amy Rowley's promotions in determining that she had been afforded a FAPE, the Court limited its analysis to that one case and recognized that promotions were a fal-

5. In further testimony she stated that she had sent the Halls written notice, as required by the Act, in January of 1979. Later testimony established, however, that the model for the form purportedly sent to the Halls at that date was only drafted more than a year later.

6. Section 1401(19) provides in part that an IEP shall include "a statement of the specific educational services to be provided to [the handicapped] child." The district court found that the two IEPs developed by the school prior to January, 1982, lacked the requisite specificity.

lible measure of educational benefit. *Id.* at 202, 203 n. 25, 102 S.Ct. at 3049 n. 25. The district court did not err in discounting James' promotions in light of the school's policy of social promotion and James' test scores and independent evaluations. Nor was the district court compelled by a showing of minimal improvement on some test results to rule that the school had given James a FAPE. *Rowley* recognized that a FAPE must be tailored to the individual child's capabilities and that while one might demand only minimal results in the case of the most severely handicapped children, such results would be insufficient in the case of other children. Clearly, Congress did not intend that a school system could discharge its duty under the EAHCA by providing a program that produces some minimal academic advancement, no matter how trivial. We do not believe that the district court committed error in determining from the tests taken as a whole and the independent evaluations pronouncing James "functionally illiterate" and "untestable" that the Vance County schools had failed to provide James with a FAPE before January 1982.[7]

## IV.

In sum, we see no error in the district court's finding that the Vance County schools had failed to provide James a free appropriate public education and that the appropriate placement for James until the end of the 1983–84 school year was at the Oakland School. We see no merit in defendants' remaining arguments. We therefore affirm the judgment of the district court.

AFFIRMED.

7. Defendants also contend that the district court failed to find that the Oakland School was an appropriate placement. Although the district court nowhere explicitly so stated, we think that the finding that the Oakland School was an appropriate placement is implicit and obvious in the district court's opinion. We note that the district court stated that plaintiffs carried the burden of proving that the costs they incurred

were in connection with providing James an appropriate education, and that it held that they had not met this burden with regard to the tuition at Vance Academy and the costs of tutoring James pending enrollment at Oakland. On the other hand, it clearly believed Oakland School to be an appropriate placement, and we do not think that its finding was clearly erroneous.