Karen R. LINKOUS, et al., Plaintiffs,

v.

S. John DAVIS, et al., Defendants.

Civ. A. No. 82–0827–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

April 18, 1986.

Stephen D. Rosenthal, Office of Atty. Gen., Richmond, Va., for plaintiffs.

Phillip C. Stone, Douglas L. Guynn, Wharton, Aldhizer & Weaver, Harrisonburg, Va., for Saari, Lanum, Long, Netto, Williams, Miller, Bren, Carter, Gross and Montgomery County School Bd.

## MEMORANDUM OPINION

KISER, District Judge.

### I. Introduction

On November 9, 1982, Karen Rachelle Linkous and her parents, Paul A. and Jackie Linkous, filed a lengthy complaint against numerous Defendants allegedly associated with, either directly or indirectly, Karen's education or lack thereof in the school system of Montgomery County, Virginia. On April 27, 1983, the motion to dismiss, filed on behalf of the various Commonwealth Defendants, was granted. The Superintendent of Public Instruction, as well as the Board of Education of the Commonwealth, were dismissed as parties. The Court also dismissed the individual Commonwealth Defendants, S. John Davis and present and former members of the Board of Education, in their official and individual capacities. The case proceeded with regard to the Montgomery County Defendants. These Defendants included Dr. Arnold J. Saari, the Superintendent of Schools, as well as the Montgomery County School Board and its present and past individual members. All the individual De-fendants were sued in both their individual and official capacities.

Currently before this Court are renewed motions by Defendants for summary judgment and by Plaintiffs for partial summary judgment. For the reasons stated hereinafter, Plaintiffs' motion is granted and Defendants' motion is denied.

### II. Background

Plaintiffs' action encompassed the 1977–78, 1978–79, and 1979–80 school years during which time Plaintiff Karen Linkous [hereinafter "Karen"] was a minor of high school age.[1] According to the exhibits submitted by stipulation, Karen was enrolled, beginning in the 1972 school year, in the learning disabilities (LD) program in the school system of Montgomery County.[2]

The circumstances that led to the present litigation arose early in the 1977–78 school year when Karen experienced problems in the clinical practice aspect of her Health Occupations (HO) class at Blacksburg High School. On October 17, 1977, a meeting of the school principal, special education supervisor, vocational director, HO teacher, LD teacher, and guidance counselor determined that Karen should be removed from the program and that "[a]n alternative program would be discussed with Karen and her parents." (Exhibit 1). Later the same day, the principal and the guidance counselor met with Karen's parents, who opposed any change. Nevertheless, Karen was removed from the program and began her new schedule the following day. (Exhibit 2).

On December 6, 1977, the placement committee met and decided that Karen was not an LD student, that she would gradually be removed from LD services, and that in the spring of 1978 she would be afforded an opportunity to consider several vocational programs and, cooperatively with teachers of those programs, make a choice. (Ex-

---

**1.** The record discloses that Karen's date of birth was July 10, 1962.

**2.** A May 16, 1978, report prepared by the LD teacher states that LD placement "is for the intellectually normal or bright students who have a *specific* learning deficit which prevents them from functioning according to their potential." (Exhibit 53).

hibit 3). Two days later the parents were informed of the committee's findings, (Exhibit 4), and on December 12, another conference was held. This meeting was attended by Karen's parents, the principal, the guidance counselor, and the school psychologist, as well as by a psychologist who had privately evaluated Karen and who felt that Karen was learning disabled. In fact, the written report of the private psychologist stated that a "severe learning disability" was indicated and among the report's recommendations were "[i]ncreased services from the learning disability teacher" in several identified areas of need.

The final result of the meeting was that Karen would remain in the LD program for the rest of the school year and be re-evaluated by the placement committee at the end of the term. (Exhibit 5). As evidenced by correspondence from Karen's mother to school personnel, particularly her letter of February 14, 1978, Mrs. Linkous was very dissatisfied with the December 12 meeting. (*See, e.g.,* Exhibit 9).

The placement committee met again on May 16, 1978, and Karen's parents received almost the three week notice they had requested for this meeting. (*See* Exhibits 10 and 12). The recommendation of the committee at the May 16 meeting was that Karen transfer to Christiansburg High School for a "fresh start" where she would receive "support services from a special behavioral management class for the emotionally handicapped." (Exhibit 17a). On the same form, which was entitled "Parental Permission for Removal from Special Services," Mrs. Linkous executed the following section and dated it June 30, 1978:

⸱ I DO NOT GIVE PERMISSION FOR MY CHILD ... to be removed from the Special Education Program described above. I understand that I have the right to review her/his records and to request another placement. I understand that the action described above will not take place without my permission or until due process procedures have been exhausted. I understand that if my decision is appealed, I will be notified of my due process rights in this procedure.

Actually no program was described on this form, but presumably the reference was to the program in which Karen was enrolled at Blacksburg High School.

At least as early as July of 1978, it appears that Karen's parents were seriously considering placement of Karen in a private school, and Karen was enrolled at Pine Ridge School, Williston, Vermont, for the 1978–79 and 1979–80 school years. Correspondence continued through the summer of 1978 between the family and school officials, and on September 5, 1978, the eligibility committee met and denied the parents' request for tuition assistance. The program proposed by the committee would have given Karen instruction at Christiansburg High School in history and English, the two academic courses she needed for graduation, and vocational training in food services and health.

On September 14, 1978, Mrs. Linkous wrote to G.E. Nolley, the associate superintendent of instruction, to appeal the denial of tuition assistance. By letter dated December 4, 1978, the school system gave notice that a hearing was scheduled for December 19. The hearing was not held as scheduled and fairly voluminous correspondence ensued between Max Jenkins, who was appointed Hearing Officer in the matter, and the attorneys for both sides.

Not until February 4, 1980, approximately seventeen months after Karen began to attend private school and tuition assistance was initially denied, was a hearing finally convened. That hearing and a subsequent one held on March 17, 1982, did not focus on the merits but rather concentrated upon whether the unilateral decision by the Linkouses for the private placement of Karen was an automatic bar to their seeking reimbursement for Karen's tuition at Pine Ridge. On March 6, Hearing Officer Jenkins issued a three page opinion in which he reluctantly concluded that section 615(e)(3), 20 U.S.C. § 1415(e)(3) of the Education for All Handicapped Children Act of 1975 (EAHCA or EHCA), 20 U.S.C. § 1415,

and the applicable federal regulation precluded tuition assistance. Section 615 went into effect on October 1, 1977, and subsection (e)(3) provides as follows:

> During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the public school program until all such proceedings have been completed.

At the time of the first hearing, little case law existed with regard to the issue and the Hearing Officer basically adhered to the literal language of the statute.

Subsequently, the Linkouses appealed the decision of Jenkins and a hearing was convened on March 17, 1982, before Robert Copeland, the Reviewing Officer appointed by the Virginia Department of Education. The focus of that hearing was on the decision rendered on May 27, 1980, by the United States Court of Appeals for the Fourth Circuit in *Stemple v. Board of Education of Prince George's County*, 623 F.2d 893 (4th Cir.1980).[3] The *Stemple* court noted the dearth of legislative history on section 615(e)(3) and focused on giving the statute literal effect. The court said,

> Taken literally, the language of § 615(e)(3) creates a duty on the part of parents who avail themselves of the hearing and review provisions of § 615 to keep their child in his current educational assignment while the hearing and review provisions are pending, absent agreement between them and the education authorities that some different arrangement be made. Of course, that duty may not be totally enforceable by the state, but it certainly negates any right on the part of parents, in violation of the duty and in the absence of agreement, to elect

unilaterally to place their child in private school and recover the tuition costs thus incurred.

*Id.* at 897.

### III. The "Stay Put" Rule of 20 U.S.C. § 1415(e)(3)

The threshold issue in the motions filed by Plaintiffs and Defendants is whether the "stay put" rule embodied in 20 U.S.C. § 1415(e)(3) automatically precludes tuition reimbursement for Mr. and Mrs. Linkous for the two years Karen was a student at Pine Ridge. Plaintiffs contend that the case of *Burlington School Committee of the Town of Burlington v. Department of Education for the Commonwealth of Massachusetts*, —— U.S. ——, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), has in effect overruled *Stemple* and that *Stemple* is thus no longer good law in the Fourth Circuit. Plaintiffs' position is well taken and is buttressed by the decision reached by the United States Court of Appeals for the Fourth Circuit in *Hall v. Vance County Board of Education*, 774 F.2d 629 (4th Cir.1985).

In *Burlington*, the father of a handicapped child had rejected a proposed individualized education program (IEP) presented in June for the upcoming school year and had sought review under § 1415(b)(2) by the state's bureau for such proceedings. By agreement of the parties, the hearing scheduled for August 8 was postponed, and no hearing was held until after the father enrolled the child in a private school in mid-August and the child began attending classes in September. In January, 1980, after several hearings, the hearing officer determined that the proposed IEP was inappropriate and ordered the town to reimburse the parents for transportation and tuition expenses.

Following a complicated procedural history in federal district court, where the town had sought judicial review of the state's administrative decision, a trial was held. The result of that trial was that the admin-

---

**3.** The United States Supreme Court denied *certiorari* in *Stemple* on February 23, 1981. *See* 450 U.S. 911, 101 S.Ct. 1348, 67 L.Ed.2d 334.

istrative decision was overturned and tuition reimbursement was thus denied.[4]

Ultimately, the case reached the United States Court of Appeals for the First Circuit, which made rulings on numerous issues.[5] The Supreme Court granted the town's petition for a writ of certiorari[6] but agreed to consider only two issues: "whether the potential relief available under § 1415(e)(2)[7] includes reimbursement to parents for private school tuition and related expenses, and whether § 1415(e)(3) bars such reimbursement to parents who reject a proposed IEP and place a child in private school without the consent of local school authorities." —— U.S. at ——, 105 S.Ct. at 2002. A unanimous Court answered the first issue in the affirmative and second issue in the negative.

The Court's opinion began by reviewing the ambitious and laudable purpose of the Act, found at 20 U.S.C. § 1400(c), that there be a free appropriate public education (FAPE) available to all handicapped children. It also surveyed the Act's definition of a FAPE.[8] The Court also examined the requirements for an IEP and its formulation.

The *modus operandi* of the Act is the already mentioned 'individualized educational program.' The IEP is in brief a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs. § 1401(19). The IEP is to be developed jointly by a school official qualified in special education, the child's teacher, the parents or guardian, and where appropriate, the child. In several places, the Act emphasizes the participation of the parents in developing the child's educational program and assessing its effectiveness. See §§ 1400(c), 1401(19), 1412(7), 1415(b)(1)(A), (C), (D), (E), and 1415(b)(2); 34 CFR § 300, 345 (1984).

Id., —— U.S. at ——, 105 S.Ct. at 2002.

Concluding that "appropriate relief" under § 1415(e)(2) would indisputably encompass in certain situations "a *prospective* injunction directing school officials to develop and implement at public expense an IEP placing the child in a private school," *id.* 105 S.Ct. at 2003 [emphasis supplied], the Court went on to comment that certainly the time-consuming administrative and judicial review process set up by the Act required *retroactive* reimbursement to parents in proper cases. The Court reasoned that when parents disagreed with a proposed IEP for a particular school term, they thus were faced with the choice either of cooperating with the school authorities to the detriment of the child if the IEP were later judged inappropriate or of paying for an educational placement they deemed appropriate. Conscientious and financially able parents would, of course, choose the latter action and "it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed." *Id.* The Court noted, "If that were the case, the child's right to a *free* appropriate public education, the parents' right to participate fully in

---

**4.** Several aspects of further court proceedings are being omitted from my discussion here as they are irrelevant to the matters now before this Court.

**5.** 736 F.2d 773 (1st Cir.1984).

**6.** 469 U.S. ——, 105 S.Ct. 562, 83 L.Ed.2d 504 (1984).

**7.** Section 1415(e)(2) provides in pertinent part as follows:

In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

**8.** Section 1401(18) defines a FAPE as

special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program....

developing a proper IEP, and all of the procedural safeguards [in the Act] would be less than complete." *Id.* [emphasis in original].

Nevertheless, in *Burlington*, the town argued, as have the school authorities in the present case, that the parents had waived any right to reimbursement because they had violated the "stay put" provisions of § 1415(e)(3). The Court disagreed for several reasons. First, this statutory subsection is silent with regard to reimbursement and if interpreted as automatically cutting off the possibility of reimbursement, the Act's dual objectives of giving handicapped children not only an appropriate education but also a free one would be frustrated. Second, the legislative history of the Act supports interim placement to meet the needs of the child and the state. Third, at least one purpose of the subsection was to prevent school officials from removing children from regular classrooms over parental objections, thus "relegating handicapped children to private institutions or warehousing them in special classes." Fourth, § 1415(e)(3) is in a section of the Act in which procedural safeguards primarily for the benefit of parents and children are set forth.

The final statement by the Court dealt with the effect of the subsection on parents.

This is not to say that § 1415(e)(3) has no effect on parents. While we doubt that this provision would authorize a court to order parents to leave their child in a particular placement, we think it operates in such a way that parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk. If the courts ultimately determine that the IEP proposed by school officials was appropriate, the parents would be barred from obtaining reimbursement for any interim period in which their child's placement violated § 1415(e)(3). This conclusion is supported by the agency's interpretation of the Act's application to private placements by the parents:

'(a) If a handicapped child has available a free appropriate public education and the parents choose to place the child in a private school or facility, the public agency is not required by this part to pay for the child's education at the private school or facility....

'(b) Disagreements between a parent and a public agency regarding the availability of a program appropriate for the child, and the question of financial responsibility, are subject to the due process procedures under [§ 1415].' 34 CFR § 300.403 (1984).

*Id.* 105 S.Ct. at 2005.

The Fourth Circuit decision in *Hall, supra,* came less than six months after the Supreme Court decided the *Burlington* case. In fact, the appellate court, after hearing initial argument, stayed decision in *Hall* until a ruling was made in *Burlington* and thereafter received supplemental memoranda addressing the *Burlington* holding.

James A. Hall, IV [hereinafter "James"], the student in the *Hall* case, was sixteen years old by the time his case was decided in 1985 in the Fourth Circuit, but the circumstances out of which the lawsuit directly arose began just prior to the 1980–81 school term. After James had progressed from kindergarten through first grade, his reading problems became increasingly evident and he repeated the second grade. The school psychologist evaluated James at the parents' request and made several recommendations, none of which the school system instituted.

In the third grade, James was further evaluated, and an IEP was drafted to cover the second half of that school term and the following term, to which he was promoted even though he received a failing grade in third grade reading. The IEP called for James to spend all of his school week in a regular classroom except for one or two hours a week spent in a learning disabilities resource room with other LD students.

Academically, James showed little improvement in fourth grade, but the school proposed continuing substantially the same IEP. At this point the Halls withdrew James from school and pursued several courses of action, among them a private evaluation which diagnosed James as suffering from dyslexia, a severe learning disability that hinders one's ability to decipher written symbols. James was tutored privately at home because no opening existed at the Oakland School, a residential school the Halls had chosen for James. Meanwhile, the Halls, who had belatedly learned of their rights under the EAHCA, began unsuccessfully urging the school system to approve the Oakland placement for the 1981–82 term.

The school district had James evaluated in December, 1981, and concluded that even though James had progressed considerably at Oakland, he should be returned to the school system under a new IEP. A local hearing examiner and, subsequently, the state reviewing officer both concluded that placement within the school system was appropriate even though the IEP needed revision. Further, the state officer found that the school system had failed to provide a FAPE for James prior to January, 1982, but that no tuition or costs could be reimbursed to the parents. The district court agreed on the FAPE decision, but concluded that reimbursement was in order in view of blatant violations of the procedural requirements of the EAHCA, 20 U.S.C. § 1415. Moreover, the court concluded that the school district could not provide a FAPE for the 1983–84 school year and directed that it pay James' costs at Oakland for that school year.

In the Fourth Circuit defendants relied on *Stemple* and made essentially the same arguments rejected in *Burlington* that tuition reimbursement was not part of the "appropriate relief" under 20 U.S.C. § 1415(e)(2) that a court was empowered to grant and, even if such relief could be granted, the parents had waived it through violating § 1415(e)(3). On the waiver issue, the circuit court stated that "[o]ur contrary rule in *Stemple* is superseded by *Burling-*

*ton* ", 774 F.2d at 633, and further concluded, "Defendants' contentions that the Act only permits injunctive relief or bars a reimbursement remedy where parents unilaterally change the child's placement have no force in light of *Burlington*." *Id.* at 634.

In a footnote, the *Hall* court discussed defendants' argument that *Burlington* be construed to permit reimbursement only when review proceedings were pending. The court declined to read *Burlington* so narrowly but stated that, as in *Hall*, when the failure of parents to invoke such review proceedings resulted from the school system's failure to advise the parents of their rights, "unilateral placement of the child should not, in our view, be treated as a waiver of a reimbursement remedy." *Id.* at 633–34 n. 4.

Having carefully studied *Burlington* and *Hall* as they impact on the present case, I am convinced that Mr. and Mrs. Linkous' unilateral placement of Karen at Pine Ridge School during the pendency of review proceedings does not serve as an automatic bar to a reimbursement remedy. Rather, in line with the *Burlington* rationale, I find that Karen's parents acted at their own financial risk so that they are barred from recovery only if this court finds that the proposed IEP was appropriate and that Karen would have received a FAPE in the public school system of Montgomery County.

## IV. The Merits

The merits of this case were never addressed in the administrative proceedings conducted pursuant to 20 U.S.C. § 1415(b)(2) before Max Jenkins and § 1415(c) before Robert Copeland. Both administrative decisions, as noted in the foregoing discussion, were rendered solely on the issue of whether the parents had waived their rights to seek tuition reimbursement through their violation of the § 1415(e)(3) "stay put" rule. It is, therefore, with great reluctance in view of the length of time this case has taken to reach its present posture that this court remands

the case for consideration of the merits at the administrative level.

The administrative record was not filed with this court until February of 1986, and that record makes clear the fact that the merits were not addressed in either prior hearing. I recognize that under § 1415(e)(2) a reviewing court has broad powers and "shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." That subsection, however, appears to be predicated upon the premise that an administrative decision on the merits has been rendered and is being challenged by the aggrieved party. The only issue ruled on administratively was the automatic waiver issue, and I have now reversed those rulings. Thus, the merits are ripe for resolution and certainly any decisions rendered thereon may be presented in federal court for review at the appropriate time.

Although the administrative decisions did not reach the merits of this case, evidence which bore on the merits was presented at the administrative level. I have carefully examined the exhibits and administrative record and were it within my province to make a decision on whether to reimburse Karen's parents for the tuition they paid for her private schooling at Pine Ridge, it is probable that the Plaintiffs would prevail under a "preponderance of the evidence" standard. Moreover, I have studied the decision of a divided Supreme Court in *Hendrick Hudson Central School District Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the first case to interpret any provision of the EAHCA. The holding in *Rowley* was examined in detail by the United States Court of Appeals for the Fourth Circuit in *Hall, supra*. The *Rowley* majority opinion made the following observation with regard to judicial review:

> [A] court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act?[27] And second, is the

individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? [footnote omitted] . . .

> [27] This inquiry will require a court not only to satisfy itself that the State has adopted the state plan, policies, and assurances required by the Act, but also to determine that the State has created an IEP for the child in question which conforms with the requirements of § 1401(19).

458 U.S. at 206–07, 102 S.Ct. at 3051.

In the present case, Mr. and Mrs. Linkous have complained not only about Karen's proposed move from the LD program at Blacksburg to a new program at Christiansburg but also about the procedures utilized in Montgomery County to effect this change. The *Rowley* Court majority opinion placed great emphasis on procedural safeguards and stated,

> [W]e think that the importance Congress attached to these procedural safeguards [in § 1415] cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, *see, e.g.,* §§ 1415(a)–(d), as it did upon the measurement of the resulting IEP against a substantive standard. We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

*Id.* at 205–06, 102 S.Ct. at 3050.

It appears to me that "adequate compliance" procedurally embodies more than having parents physically in attendance at meetings and permitting them to present their side of an issue already decided in advance by school authorities. Rather, I would think the EAHCA and supporting

regulations contemplate that what the parents present, particularly through expert witnesses in relevant areas, must be seriously considered and examined before a local educational agency may proceed to alter a child's placement. On remand, examination must occur of the procedural aspects of this matter, as well as the issue of whether Karen, beginning with the 1978–79 school term, was given access to specialized public school instruction and services "individually designed to provide *educational benefit*" to her, as required by *Rowley*, 458 U.S. at 201, 102 S.Ct. at 3048 [emphasis supplied], and subsequent cases.

An appropriate order shall be filed in accordance with the foregoing discussion. The Clerk is directed to send a certified copy of this Memorandum Opinion to all counsel of record.