828 F.2d 1059
 41 Ed. Law Rep. 830
 Cody HUDSON, an infant who sues By and Through his
grandmother and next friend, Nancy TYREE,
Plaintiff-Appellant,
v.
Bayse WILSON, Superintendent of Roanoke County Schools;
Eddie Kolb, Director, Special Education; Paul
Orcutt, Roanoke County School
Psychologist, Defendants-Appellees,
and
S. John Davis, Dr., Superintendent of Public Instruction,
State Department of Education, Defendant.
Cody HUDSON, an infant who sues By and Through his
grandmother and next friend, Nancy TYREE, Plaintiff-Appellee,
v.
Bayse WILSON, Superintendent of Roanoke County Schools;
Eddie Kolb, Director, Special Education; Paul
Orcutt, Roanoke County School
Psychologist, Defendants-Appellants,
and
S. John Davis, Dr., Superintendent of Public Instruction,
State Department of Education, Defendant.
 Nos. 87-1019, 87-1020.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 3, 1987.
Decided Sept. 16, 1987.
 
 Tonita Minge Foster, Roanoke, Va., for appellant.
 William Fain Rutherford, Jr. (John L. Walker, Jr.; Theodore R. Kingsley; Woods, Rogers & Hazelgrove; Roanoke, Va., Jean B. Arnold, Blacksburg, Va., on brief), for appellees.
 Before WIDENER, PHILLIPS, and CHAPMAN, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 This appeal and cross-appeal challenge a federal district court's application of the Education of the Handicapped Act (EHA), 20 U.S.C. Secs. 1400 et seq. Cody Hudson, a handicapped infant who initiated this suit by and through his grandmother and next friend in United States District Court for the Western District of Virginia, appeals the district court's denial of his claim for tuition reimbursement for private school instruction during his second-grade year. Cody's claim was premised on the alleged failure of the Roanoke County [Virginia] Schools (RCS) to provide him with the appropriate special education services required under the EHA. RCS and three RCS employees in turn cross appeal the district court's tuition reimbursement award to Cody for the final months of his first-grade year. Both Cody and RCS further challenge the district court's decision to reimburse Cody for one, but only one, private educational evaluation which he used to challenge RCS's placement decisions. We conclude that the district court's explication of the controlling legal standards under the EHA was correct, and that the district court's findings of fact, upon which its partial relief to Cody was premised, are not clearly erroneous. We accordingly affirm the district court's decision in its entirety.
 
 
 2
 * The history of this litigation and the precedent actions by RCS, Cody's mother and grandmother, and state administrative review officials, is fairly complicated. Cody entered RCS as a kindergartener in the 1982-83 school year. Preliminary routine screening by RCS revealed that Cody suffered from speech and language problems. Appellee Paul Orcutt, a psychologist for RCS, tested Cody, and discovered that he had a high IQ but a vocabulary six months behind the average five-year old, and that he could learn visually but could not express himself. Before the school decided on a special placement for Cody, however, and before it developed any individualized program for him, Cody was taken out of public kindergarten and enrolled in a private day school.
 
 
 3
 During the 1983-84 school year Cody returned to RCS, and Cody's regular first-grade teacher referred him for testing to determine if he needed special education. This teacher reported that Cody fantasized, used nonsense language, and performed at the bottom of his class. She also reported that he cried, was easily frustrated, had trouble controlling his temper, formed few relationships with his classmates, and often did not perform his work.
 
 
 4
 Orcutt tested Cody for the second time on January 24, 1984. On the basis of the five tests he performed at that time, Orcutt concluded that Cody's difficulties were related to his emotional development. Orcutt then recommended an independent psychiatric evaluation and RCS retained Dr. William Gray. Following a brief examination, Dr. Gray concluded that Cody suffered from a "thought disorder" but was not psychotic. Significantly, neither Orcutt nor Gray tested Cody appropriately to determine if any or all of his problems stemmed from a learning disability rather than an emotional disturbance. Orcutt in fact informed Cody's mother and grandmother that, in his opinion, Cody did not require testing for a learning disability.
 
 
 5
 On March 1, 1984, RCS held an eligibility meeting to determine if Cody was a handicapped child and to discuss an appropriate educational placement. Before this meeting, Cody's mother and grandmother arranged private testing for Cody, at their own expense, by a private school psychologist. This psychologist, Dr. Gene Watson, conducted nine tests to determine if Cody was learning disabled and concluded that he was: specifically, he diagnosed an "attentional deficit disorder" (a language processing disorder) and developmental dyslexia. Dr. Watson appeared at the eligibility meeting, presented his findings to the committee, and recommended that Cody be placed in a learning disability classroom. The committee, however, decided that Cody should be placed in a "Behavioral Adjustment" (B.A) classroom for severely emotionally disturbed children, relying on the evaluations by Orcutt and Gray and the anecdotal observations of Cody's first-grade teacher.
 
 
 6
 The status of this RCS placement decision is open to some factual dispute. RCS claims that it never ruled out another ultimate placement but only insisted that it first conduct its own corroborative testing for learning disabilities, though this insistence does not explain its decision to place Cody in a possibly inappropriate B.A. classroom pending such testing. What is clear is that the March meeting ended in a heated discussion between Dr. Watson and the RCS committee and that Cody's mother and grandmother removed Cody from RCS and placed him in a special private school for learning disabled children. At RCS's request, and after Cody had already been withdrawn from RCS, Dr. Watson retested Cody; the tests confirmed his earlier results. After this additional testing at RCS's request, and without any modification by RCS of its placement decision, Cody's mother and grandmother withdrew their consent for additional testing by RCS. They did, however, obtain further corroborative tests by two other doctors at their own expense; both doctors recommended a learning disabilities placement for Cody.
 
 
 7
 For the 1984-85 school year (Cody's second-grade year), RCS held a second eligibility meeting. The committee met on August 30, 1984, studied the testing conducted by Dr. Watson and the other private psychologists who examined Cody, and concluded that Cody did indeed require learning disabilities instruction. Significantly, RCS reached this conclusion without conducting any corroborative testing by its own personnel despite its earlier insistence that such RCS corroboration was essential. The placement recommended by RCS, however, still did not provide what Dr. Watson recommended and what Cody's mother and grandmother sought, namely full-time instruction for Cody in a self-contained learning disabilities classroom. Specifically, RCS decided that Cody would be best served by a dual placement under which Cody would spend four hours each day in a B.A. classroom, forty-five minutes in a learning disabilities resource classroom, and the remainder of his day in regular classrooms. On September 18, 1984, RCS presented Cody's formal "individualized education program" (IEP) to his mother and grandmother. They promptly requested a hearing to contest the placement and enrolled Cody in a private school for learning disabled children where Cody remained for the 1984-85 second-grade school year.
 
 
 8
 The first step in the administrative review process came when a Hearing Officer decided that Cody's 1984-85 placement was "appropriate" but that Cody was entitled to tuition reimbursement for the end of the 1983-84 school year when he was placed in a private school. The Hearing Officer concluded that this initial placement by RCS ignored Cody's demonstrated need for learning disabilities instruction. The Hearing Officer also concluded that Cody was entitled to reimbursement for the private testing conducted by Dr. Watson as well as for all of the subsequent corroborative testing which was used by RCS. Both parties appealed.
 
 
 9
 The second step in the administrative review process came in May 1985 when a state Review Officer held a State Review Hearing. The Review Officer concluded that the 1984-85 placement was "appropriate," and that Cody was not entitled to reimbursement for the 1983-84 year since RCS had not completed the process of formulating a program for Cody when his mother and grandmother withdrew permission for additional testing by RCS.
 
 
 10
 The third step in the review process came when Cody filed this action on November 25, 1985, claiming violations of the EHA and of related state statutes and regulations. Following a de novo hearing, the district court found in concert with the Hearing Officer and Review Officer that Cody's 1984-85 placement was "appropriate" and that he was therefore not entitled to tuition reimbursement for his second-grade year. The district court, however, disagreed with the State Review Officer, and agreed with the Hearing Officer, about tuition reimbursement for the final months of the 1983-84 school year. The district court rejected RCS's argument that it was entitled to evaluate Cody before it became liable for tuition reimbursement, noting that RCS failed to test Cody adequately before March, had the benefit of Dr. Watson's evaluation at the March meeting, and did in fact belatedly develop an appropriate placement and program for Cody using the information presented at the March meeting. The district court also concluded that Cody should be reimbursed for Dr. Watson's testing but not the other independent evaluations because the applicable regulations contemplate reimbursement for only one private testing.
 
 
 11
 These appeals followed.
 
 II
 
 12
 The most heatedly contested questions in this litigation concern Cody's entitlement to tuition reimbursement for his private schooling at a special school for learning disabled children between March 1984 and the end of the 1984-85 school year. Cody claims that he should be reimbursed for the entire period, because RCS never provided special instruction adequate to guarantee him a "free appropriate public education" and because RCS failed to comply with various procedural requirements imposed by the EHA. RCS counters that it complied with the Act's procedural requirements, its 1984-85 placement was reasonably calculated to meet Cody's education needs, and Cody's March 1984 placement, whose inadequacy RCS implicitly conceded when it later changed the placement, did not justify tuition reimbursement as an appropriate remedy. Both parties thus challenge the district court's disposition of the tuition reimbursement issue.
 
 
 13
 Turning first to Cody's appeal, we conclude that the district court applied the correct legal standard, and made a dispositive finding of fact which is not clearly erroneous, when it concluded that Cody's 1984-85 placement complied with the requirements of the EHA. Because a district court must first find a substantive or procedural violation of the Act before it awards tuition reimbursement, the district court properly denied this portion of Cody's claim.
 
 
 14
 In Board of Education of the Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 206-07, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982), the Supreme Court limited a district court's inquiry into alleged violations of the EHA to two questions: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" The basic substantive requirement of the EHA is that the local school provide a "free appropriate public education" (FAPE), 20 U.S.C. Sec. 1412(1). As the Supreme Court noted in Rowley, however, this does not mean that a local school must provide the most appropriate education for each child. Rather, the Act mandates "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." Id. at 201, 102 S.Ct. at 3048; see also Hessler v. State Board of Education of Maryland, 700 F.2d 134, 139 (4th Cir.1983). Moreover, Rowley cautioned district courts to defer to the greater expertise of education officials at the state and local level. Rowley, 458 U.S. at 208, 102 S.Ct. at 3052 ("[O]nce a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States.").
 
 
 15
 In this case, RCS's 1984-85 dual placement for Cody in a B.A. and regular classroom, with forty-five minutes each day in a learning disabilities resource room, represents a reasonable judgment by local school officials that Cody suffers from both an emotional disturbance and a learning disability. The evidence of an emotional disturbance is found in Dr. Gray's evaluation as well as observations by Orcutt and Cody's first-grade teacher. In addition, while enrolled in a private school for learning disabled children, Cody received some counseling for an emotional problem. This evidence in support of Cody's dual placement was vigorously and cogently challenged below. The district court revealed some skepticism about the support for the school authorities' placement decision. So might we, were we making the initial decision on the record we review. But we are not, and we cannot say that the district court either improperly applied the Rowley standard or reached a clearly erroneous conclusion--undoubtedly somewhat deferring, as Rowley commands, to the school authorities' expertise--that Cody needs both types of special assistance and that he can also function for part of the day in a regular classroom. The district court properly concluded that Cody's ultimate placement enabled him to "benefit" from a public education.
 
 
 16
 We similarly conclude that the district court properly analyzed the other permissible "Rowley question," i.e., whether RCS complied with the elaborate procedural requirements of the Act. Such compliance is critical to the efficient operation of the Act, and serious procedural noncompliance can by itself support a finding that the child has not been provided with a FAPE. Hall v. Vance County Board of Education, 774 F.2d 629, 635 (4th Cir.1985). In this case, however, the Hearing Officer, the Review Officer, and the district court have all agreed that RCS fulfilled its procedural obligations. We cannot say that the district court's assessment of RCS's procedural compliance was clearly erroneous. See Hall, 774 F.2d at 634.
 
 
 17
 Turning next to RCS's cross appeal, we again conclude that the district court applied the correct legal standard and reasonably concluded that Cody should receive tuition reimbursement for the final months of the 1983-84 school year. RCS argues that when Cody unilaterally withdrew from school before the institution of administrative proceedings, before the final preparation of a formal "individualized education program," and before permitting RCS to conclude its own "corroborative testing," he waived any right to tuition reimbursement. Cody defends this portion of the district court's decision by arguing that the RCS committee's decision to place him in a self-contained (full-time) B.A. classroom despite ample time to test him, and in the face of Dr. Watson's unequivocal test results, denied him a FAPE and thus entitled him to the equitable reimbursement remedy.
 
 
 18
 It is now settled that parents may be entitled to tuition reimbursement despite their unilateral withdrawal of their child from the public school. Burlington School Committee v. Department of Education, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The parents, of course, withdraw the child at the risk that the subsequent administrative and judicial review will establish that the contested placement provided a FAPE. In Burlington, however, the court noted the cruel dilemma an arguably inappropriate placement offers the parents: either leave the child in an inappropriate classroom pending the long process of review or waive any right to tuition reimbursement for alternative schooling. The Court accordingly held that a prior unilateral withdrawal did not waive the child's right to such an equitable remedy at the end of the review process. Id. at 370, 105 S.Ct. at 2003.
 
 
 19
 This case presents a number of variations to the tuition reimbursement issue as framed by Burlington. The district court reasonably concluded that the March 1984 placement was not "appropriate," because it failed to recognize and address Cody's learning disability. Cody, however, unilaterally withdrew from RCS before instituting these review proceedings, before RCS had completed the full process of implementing a formal IEP, and before RCS completed all the corroborative testing it claimed it needed. The broad question is whether any of these facts barred the district court from fashioning its equitable remedy.
 
 
 20
 The first issue concerns the effect of withdrawing Cody before instituting an administrative "due process hearing" and before RCS completed Cody's formal IEP. In Hall, the defendants argued that unilateral placement should bar the parents' recovery of tuition reimbursement if they had not initiated review of the school's formal IEP before withdrawing their child, but the court was not required to resolve the issue. 774 F.2d at 633 n. 4. RCS here repeats that argument, but, on these facts, we reject such a hypertechnical limitation on relief under the EHA. While the formal IEP is the keystone of the EHA process and no formal IEP for Cody was prepared until the 1984-85 school year, RCS unequivocally announced its decision to place Cody in a B.A. classroom in March 1984. As a direct result of RCS's ensuing derelictions, the Committee's March 1984 decision did not provide Cody with a FAPE, and RCS was not providing him a FAPE in his regular first-grade classroom. Cody failed in the classroom until January, when he was finally referred for testing. Between January and March, RCS failed to conduct the necessary tests, even though his kindergarten testing suggested a language disorder. At the March meeting, before making its placement decision, the Committee received Dr. Watson's evaluation and test results. By the time of the March meeting Cody's mother and grandmother were already in the throes of the dilemma described in Burlington, and the district court, after criticizing RCS's dilatory identification of Cody's handicap, properly awarded them an equitable remedy.
 
 
 21
 RCS also asserts its "responsibility" to corroborate Dr. Watson's private testing before using it in making a placement or formulating an IEP. RCS suggests that it would have corrected any error in its March placement decision as soon as it received such corroboration, and that parents should not be encouraged to withdraw their children before submitting to corroborative testing. As the district court notes, this argument is flawed in several respects. First, RCS was certainly not obligated to place Cody in a B.A. classroom without first testing him for a learning disability--and it never offered simply to withhold its placement decision pending such results. Second, the EHA clearly permits parents to obtain private testing and nowhere implies that local schools must corroborate private results before using them. Third, as the district court noted, RCS in fact changed its placement for 1984-85 without itself conducting any more of the corroborative tests it insists it had a "responsibility" to conduct. This is not a case where a parent's refusal to permit testing left the school without evidence to support a placement or left the court without evidence to determine if the child was receiving a FAPE. Even if it were, exhaustive testing should not be used as an extra-statutory administrative requirement that a parent must "exhaust"; it is enough that the incomplete testing limits the opportunity of the court to find that the child in fact did not receive a FAPE. In other words, the parents' refusal to permit additional testing simply goes to the merits of their subsequent reimbursement claim. See Dubois v. Connecticut State Board of Education, 727 F.2d 44, 49 (2d Cir.1984).
 
 III
 
 22
 The final issue, and one on which both parties again challenge the district court's decision, concerns Cody's right to reimbursement for the expense of the private educational testing which diagnosed his learning disability. The district court concluded that Cody was entitled to reimbursement for the private testing by Dr. Watson, but not for the other private corroborative tests. We agree.
 
 34 C.F.R. Sec. 300.503(b) provides:
 
 23
 a parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency. However, the public agency may initiate a hearing ... to show that its evaluation is appropriate. If the final decision is that the evaluation is appropriate, the parent still has the right to an independent educational evaluation, but not at public expense.
 
 
 24
 In challenging Cody's entitlement to reimbursement for Dr. Watson's evaluation, RCS makes two arguments. First, RCS interprets Sec. 300.503(b) to require a parent who obtains private testing to notify the school that it disagrees with its evaluation and give the school an opportunity "to show that its evaluation is appropriate" before the parent obtains the private testing. This strained reading of the regulation obviously would leave the parent with no way to challenge a school's evaluation with a reimbursed private evaluation. The plain thrust of the regulation is that the school can later challenge the private testing, and, if it then convinces the administrative reviewers and the district court that its initial evaluation was correct, the parent will not be reimbursed. We also reject RCS's argument that Cody received his one and only private evaluation at public expense when he was examined by Dr. Gray. While Cody's mother and grandmother approved Dr. Gray's selection, he was hired by RCS for RCS's own use. Section 300.503(b) provides for an "independent educational evaluation" by any parent who "disagrees with an evaluation obtained by the public agency." Since this evaluation predated the disagreement that arose precisely because of Dr. Gray's evaluation, RCS's argument is untenable.
 
 
 25
 Cody in turn argues that he should be reimbursed for all of his independent evaluations (including the expenses of an expert witness obtained for trial). However, as the district court correctly observed, Sec. 300.503(b) in terms limits reimbursement to a single evaluation.
 
 
 26
 AFFIRMED.