MURNAGHAN, Circuit Judge,
dissenting:
The majority opinion rests on a conclusion which I’find unacceptable:
[T]he statute [IDEA] only requires that States provide handicapped children with access to such an education. And, as with any other right, that right of access to educational services may be forfeited by criminal or other conduct antithetical to the right itself. A state, accordingly, no more fails to satisfy the statute’s condition when it refuses to continue educational services to a student who has forfeited his right to such services, than when it does not provide an education to a student who chooses not to avail himself of the opportunity at all.
86 F.3d at 1349.
The case actually concerns the meaning to be given to the words “a policy that assures all children with disabilities the right to a free appropriate public education.” I have found that they unambiguously convey a meaning. My colleague, Judge Hall, also dissenting, alternatively reasons that, even if there is ambiguity, following Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), would lead to the same meaning I have reached. Simply put I regard “all children” as reaching to the all encompassing height, put algebraically at 10. Judge Hall, on his assumption of ambiguity, gives the ambiguous language supposed to exist only an 8 but then ascribes at least a 2, bringing the total to 10 because of the Secretary of Education’s construction of the statutory language. The majority reaches a contrary conclusion, namely, that the statute unambiguously means what it does not say. The *573 majority argues that “all children” is meant not to encompass children with disabilities who have been expelled or suspended. Following from that conclusion, the majority concludes that such expelled or suspended children lose their rights to a free appropriate public education when their misconduct is unrelated to their disabilities. The majority thereby invents an unmentioned forfeiture to justify interpreting “all children” not to include disabled children who are suspended or expelled for misconduct unrelated to their disabilities. Thereby the algebraic figure is required to become materially less than 10.
Similarly, with the same object in mind, the words “access,” “assures” and “right” are reduced in meaning by imagining a limitation not expressed in IDEA excluding from assurance of the right to a free appropriate public education those children with disabilities who are expelled or suspended for misconduct unrelated to their disabilities. That also reduces further below 10 the value clearly applying to “all children.”
I.
My disagreement with the majority’s disposition of the instant case stems from its notion that the right provided by the IDEA is forfeitable. For the remarkable proposition it has come to, the majority does not cite to any provision of the IDEA to support its belief that the disabled child can forfeit his right to a free appropriate public education guaranteed by the statute. At issue in the instant case is a group of 126 children with disabilities who have been expelled and to whom Virginia has ceased providing educational services during the expulsion period. Those expelled children are not the only ones interested. The public generally will suffer from the denial of a free public education in the case of a child already handicapped.
Under the majority’s view, the 126 children affected by Virginia’s policy have “forfeited” their right to a free appropriate public education. The majority interprets the phrase “[t]he State has in effect a policy that assures all children with disabilities the right to a free appropriate public education,” as creating only a “right of access” to such education, not as creating a federal right to receive educational services under the IDEA. Adoption of the latter, the majority opines, would require States:
at the taxpayers’ expense, to dispatch to prisons, jails, and personal residences, private tutors to instruct those students who have so disrupted the classroom that their own instruction and that of their fellow students was rendered impossible.
86 F.3d at 1349.
Despite the fact that the majority’s view adopts the most extreme example, unsupported by the record, to make its point, it is axiomatic that a statute establishing a right may also specify under what circumstances that right may be forfeited. Congress, however, in enacting the IDEA has specified no circumstances under which a disabled child may lose by forfeiture the right to educational services under the IDEA, whether that be the federal right to a free appropriate public education, or the “right of access” to a free appropriate public education as created by the majority.[1]
In Burlington School Committee v. Massachusetts Department of Education, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the Supreme Court addressed the issue of waiver of reimbursement under the Education of the Handicapped Act (EHA).[2] As the Court recognized the EHA requires par *574 ticipating states and local educational agencies “to assure that handicapped children and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education” to such handicapped children. In Burlington, the parents of a handicapped child rejected the schools’ Individualized Educational Program (IEP) for their son and placed him in a private school without the consent of the local school authorities, in violation of § 1415(e)(3) of the Act. Thereafter, the parents sought reimbursement of the costs associated with the private school. The school authorities argued that the parents had waived their right to reimbursement by violating § 1415(e)(3). Section 1415(e)(3) provided that while administrative proceedings are pending about the child’s placement, “the child shall remain in the then current educational placement.”
The Supreme Court disagreed. The Court reasoned that § 1415(e)(3) “says nothing about financial responsibility, waiver, or parental rights to reimbursement at the conclusion of judicial proceedings. Moreover, if the provision is interpreted to cut off parental rights to reimbursement, the principal purpose of the Act will in many cases be defeated in the same way as if reimbursement was never available.” Id. at 372, 105 S.Ct. at 2004. The Court continued that:
Thus, under the Town’s reading of § 1415(e)(3), the parents are forced to leave the child in what may turn out to be an inappropriate educational placement or to obtain appropriate placement only by sacrificing any claim for reimbursement. The Act was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives.
Id. at 372, 105 S.Ct. at 2004. A similar approach in the instant case is necessary to insure a principal purpose of IDEA.
The Court did note, however, that “parents who unilaterally change their child’s placement during the pendency of review proceedings, without the consent of the state or local school officials, do so at their own financial risk. If the courts ultimately determine that the IEP proposed by school officials was appropriate, the parents would be barred from obtaining reimbursement for any interim period in which their child’s placement violated § 1415(e)(3).” Id. at 373-74, 105 S.Ct. at 2004. See also Hudson by and Through Tyree v. Wilson, 828 F.2d 1059, 1064 (4th Cir.1987) (relying on Burlington, “[i]t is now well settled that parents may be entitled to tuition reimbursement despite their unilateral withdrawal of their child from the public school.”); Hall v. Vance County Bd. of Educ., 774 F.2d 629 (4th Cir.1985) (relying on Burlington) (rejecting school officials’ argument that parents’ unilateral withdrawal of child waived any right to reimbursement). Similarly, nowhere contained in the language of the IDEA does the statute provide for the forfeiture or waiver of a disabled child’s right to a free appropriate public education.
While not speaking in terms of forfeiture, in Doe v. Maher, 793 F.2d 1470 (9th Cir.1986), aff'd. as modified sub nom. Honig v. Doe, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), the Ninth Circuit affirmed the district court’s finding that two plaintiffs with emotional disturbances had been improperly expelled for misconduct related to their disabilities. Maher, 793 F.2d at 1481-82. In a passage, properly characterized as dictum, the Ninth Circuit stated:
If a child’s misbehavior is properly determined not to be a manifestation of his handicap, the [disabled] child can be expelled. This conclusion does not conflict with the [IDEA]. When a child’s misbehavior does not result from his [disabling] condition, there is simply no justification for exempting him from the rules, including those regarding expulsion, applicable to other children. Therefore, when a [disabled] child is properly expelled, the school district may cease providing all educational services—just as it could in any other case. To do otherwise would amount to asserting that all acts of a [disabled] child, both good and bad, are fairly attributable to his handicap. We know that that is not so.
Id. at 1482. (internal footnote and internal citations omitted).
However, when the Supreme Court heard the appeal of the Ninth Circuit case, at issue *575 in Honig was the Act’s “stay-put” provision, which states that a disabled child “shall remain in [his or her] then current educational placement” until various review proceedings have been completed, unless local school officials and the child’s parents agree to the contrary. 20 U.S.C. § 1415(e)(3) (Supp. 1996). Two students who had been expelled due to “violent and disruptive conduct” arising from their disabilities, see 484 U.S. at 312-15, 108 S.Ct. at 598-600, argued that the state could not unilaterally expel them unless those procedures were followed. The Supreme Court agreed.[3] The Court held that the language of the statute was unequivocal, and rejected the school officials’ attempt “to read a dangerousness” exception into the stay-put provision. Id. at 323, 108 S.Ct. at 604.
The Court disagreed with the school officials’ contention “that Congress thought the residual authority of school officials to exclude dangerous students from the classroom too obvious for comment.” Id. Instead, the Court reasoned as follows:
We think it clear ... that Congress very much meant to strip schools of the unilateral authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school. In so doing, Congress did not leave school administrators powerless to deal with dangerous students; it did, however, deny school officials their former right to “self-help,” and directed that in the future the removal of disabled students could be accomplished only with the permission of the parents, or as a last resort, the courts.
Id. at 323-24, 108 S.Ct. at 604. The Supreme Court did not address the Ninth Circuit’s dicta.[4]
Using the persuasive rationale articulated in Honig whereby the Court refused to read a “dangerousness” exception into the Act’s stay-put provision, I refuse to read a “suspension or expulsion for conduct unrelated to disability” exception into the Act’s requirement that “all” disabled children be assured “the right to a free appropriate public education.” Virginia has concentrated on the interpretation of the phrase “all children,” but I have concluded that “all” means “all” and that concentration should more appropriately be focused on the statutory requirement of a “free appropriate public education.” See Dandridge v. Williams, 397 U.S. 471, 497, 90 S.Ct. 1153, 1168, 25 L.Ed.2d 491 (1970) (Douglas, J., dissenting) (words “all eligible individuals” in § 402(a)(1) of the [Social Security] Act ... reveal Congress’ overriding concern with meeting the needs of each eligible recipient of aid under AFDC programs) (emphasis added); ACandS, Inc. v. Aetna Cas. and Sur. Co., 764 F.2d 968, 974 (3d Cir.1985) (affirming district court’s interpretation of phrase “all sums which [insurer] shall become legally obligated to pay ...” to require insurer to pay all sums even if plaintiffs damages are caused in part in an insured period, and also caused in part during another period) (emphasis added).[5]
*576 II.
As in Burlington, the majority’s “exception” for the cessation of educational services for disabled children who are expelled from school for misconduct unrelated to their disabilities, contravenes not only the language of the IDEA but guts the purpose of the IDEA. In enacting the statute, Congress found that more than eight million children with disabilities existed in the United States; these childrens’ special education needs were not being fully met; more than half these children did not receive appropriate educational services; one million of these disabled children were “excluded entirely from the public school system”; many children with disabilities were participating in regular school programs which do not serve their educational needs because their disabilities were undetected; the burden of families of disabled children who often had to seek appropriate educational services at great expense and distance from their homes; given appropriate funding State and local agencies could provide effective education and related services for these children; State and local agencies had a responsibility to provide children with disabilities with an education; and “it is in the national interest that the Federal Government assist State and local efforts to provide programs to meet the educational needs of children with disabilities in order to assure equal protection of the law.” See 20 U.S.C. § 1400(b)(1)-®) (1990 & Supp.1996).
The purpose of the IDEA is:
to assure that all children with disabilities have available to them, within the time periods specified in # AD8E BD# 1412(2)(B) of this title, a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of children with disabilities and their parents or guardians are protected, to assist States and localities to provide the education of all children with disabilities, and to assess and assure the effectiveness of efforts to educate children with disabilities.
20 U.S.C. § 1400(e) (emphasis added). The legislative history evinces Congress’ concerns and purposes in enacting the IDEA. As the Supreme Court noted in Honig, in drafting the IDEA, Congress was guided by two district court opinions[6] which “involved the exclusion of hard-to-handle disabled students.” Honig, 484 U.S. at 324, 108 S.Ct. at 604; see also S.Rep. No. 168, 94th Cong., 1st Sess. 6 (1975), reprinted in 1975 U.S.C.C.A.N. 1425, 1430 (discussing Mills); Board of Educ. v. Rowley, 458 U.S. 176, 194, 102 S.Ct. 3034, 3044, 73 L.Ed.2d 690 (1982) (reference to Mills and PARC “suggests that the principles which they established are the principles, which to a significant extent, guided the drafters of the Act”).
Clearly, the IDEA is remedial legislation. A familiar canon of statutory construction requires courts to interpret remedial legislation, such as the IDEA, broadly to effectuate its goals and purposes. See Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967) (“we are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.”); Philbin v. General Elec. Capital Auto Lease, Inc., 929 F.2d 321, 323 (7th Cir.1991) (“Title VII is remedial legislation which must be construed liberally.”); Innovative Health Systems v. City of White Plains, 931 F.Supp. 222, 232 (S.D.N.Y.1996) (quoting Civic Ass’n of the Deaf v. Giuliani, et al., 915 F.Supp. 622, 633 (S.D.N.Y.1996) (“As a remedial statute, the [Americans with Disabilities Act] ADA must *577 be broadly construed to effectuate its purpose.”)).[7]
While recognizing the “laudable purpose”, 86 F.3d at 1350, of the IDEA, nevertheless, the majority proceeds to sanction Virginia’s decision to cease providing any educational services to those children with disabilities who are expelled or suspended for misconduct unrelated to their disabilities. As Congress recognized, but the majority apparently does not, educational services for disabled children are critical to the childrens’ ability to have a chance at achieving the successes of their non-disabled counterparts. See S.Rep. No. 168, supra, at 9, 1975 U.S.C.C.A.N. at 1433 (“With proper education services, many [disabled children] would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such [educational] services would increase their independence, thus reducing their dependence on society”).
Heralding the use of expulsion as a disciplinary tool to teach children accountability and personal responsibility for their behavior, Virginia argues that the evidence establishes that an expelled student who is readmitted is less likely to be expelled again. Virginia’s argument, of course, ignores evidence that shows that depriving children with disabilities of educational services, who are suspended long-term or expelled, is likely to have more severe consequences than denial of educational services during a similar disciplinary period for their nondisabled counterparts.
Specifically, in the record, Kevin P. Dwyer, a certified school psychologist in the State of Maryland, testified that children with disabilities who have their education ceased experience greater difficulty with retention upon returning to school. The retention issue is not novel, and is in fact, one of the principal reasons why, as Dwyer testified, “we have 12-month school for kids that are disabled that we don’t have for kids that are not disabled. That’s one of the privileges of special education more. It ... says these kids need 12 months because ... they lose it. They lose some ground during the summer.” See also Johnson v. Independent Sch. Dist. No. 4, 921 F.2d 1022, 1026-1030 (10th Cir.1990) (IDEA requires year-round program when necessary), cert. denied, 500 U.S. 905, 111 S.Ct. 1685, 114 L.Ed.2d 79 (1991); Battle v. Pennsylvania, 629 F.2d 269, 275, 280-81 (3d Cir.1980) (noting problems with retention and need for longer schooling), cert. denied sub nom. Scanlon v. Battle, 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981). Hence, the cessation of educational services to children with disabilities suspended or expelled for misconduct unrelated to their disability has drastic consequences for those students; consequences which do not apply equally to non-disabled students suspended or expelled. Such cessation has a detrimental effect whether a disabled child’s misconduct was disability related or not.
The majority in effect tries to equate two quite different things: expulsion or suspension is one thing while loss of access to a free appropriate public education is another. The majority in effect seeks to have the lesser perform the work of the greater. Suppose that disabled children can be suspended or expelled from regular schools for their misdeeds not related to their handicap. Of course that may happen. A student who acts badly may, and should be in an aggravated case, disciplined by way of suspension or expulsion. The difference with respect to the suspension or expulsion of children with disabilities, however, is that during the period of suspension or expulsion that child’s educational services must continue in an alternative setting.
Virginia contends that the continued provision of educational services to a disabled child who has been suspended or expelled for misconduct unrelated to his or her handicap is not a suspension or expulsion but merely a transfer, and hence does not effectively serve the State’s disciplinary goals as a last resort “wake-up” call to the student. Nothing in *578 the IDEA prevents Virginia from “waking up” these children with suspension or expulsion from their regular school. Virginia, however, as commanded by the IDEA must “wake up” these children by providing an education in an alternative setting during the suspension or expulsion period. The removal of the child from his or her usual classroom and friends will serve to reinforce the inappropriateness of his or her misconduct.
Virginia’s statement that “[sjpecial education students are thereby consistently governed by the same rules of accountability and personal responsibility governing others, when disability is not an issue ” represents the lack of understanding of the problem presented in the instant case. Petitioner’s Brief, at 12 (emphasis added). Regrettably, for a child with a disability, disability is always an issue and relevant. For that child remains disabled when he or she is suspended or expelled from school. An analysis which fails to consider the consequences of the cessation of educational services on a disabled child, fails, in my view to effectuate the purposes of IDEA. The stated purpose of the IDEA is to provide all children with disabilities a free appropriate public education so that those children can become productive members of our society, in the same way as non-disabled children. The IDEA is designed, to the extent possible, to provide disabled children with the tools necessary to close the gap between them and their non-disabled counterparts. I fail to see how ceasing the educational process serves that goal.
Undergirding Virginia’s argument, adopted by the majority, is the notion that children with disabilities are being treated differently than their non-disabled counterparts, and failure to cease educational services to these students, as schools do with non-disabled expelled or suspended students, sends the message that children with disabilities are not responsible for their actions. The continuation of educational services to disabled students who are suspended or expelled would result in a “harmful double standard” between the treatment of disabled and non-disabled students, Virginia maintains.
In S-1 v. Turlington, 635 F.2d 342 (5th Cir.), cert. denied, 454 U.S. 1030, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981), the Fifth Circuit addressed the issue of nine disabled chil-drens’ rights under the IDEA, when the children were expelled from school. After concluding that an expulsion constituted a change in placement for IDEA [then EHA] purposes, the court addressed the discipline issue. The Fifth Circuit in responding to the school officials’ argument that removing the disciplinary tool of expulsion with respect to a disabled child would “insulat[e]” a disabled student, the court stated “expulsion is still a proper disciplinary tool ... when proper procedures are utilized and under proper circumstances.” Id. at 348. Thus, the court determined that before a disabled student could be expelled the student was entitled to a hearing to determine whether his misconduct was related to his disability. Nevertheless, the court stated that “[w]e cannot, however, authorize the complete cessation of educational services during an expulsion period.” Id.; see also Kaelin v. Grubbs, 682 F.2d 595, 597 (6th Cir.1982) (following Turlington analysis to conclude that disabled child may be expelled, only after a due process hearing determines that misconduct was not related to handicap, and during the expulsion period educational services may not cease); and see School Bd. v. Malone, 762 F.2d 1210, 1218 (4th Cir.1985) (court held that disabled student could not be expelled for behavior caused by his disability but declined to address “whether some level of educational services must be continued to a lawfully expelled handicapped child, and if so, to what extent.”).
Children with disabilities are not, and cannot be treated, the same as non-disabled students. Any argument based on strict equality of treatment for disabled and non-disabled children must fail. In enacting the IDEA, Congress indeed granted disabled children “more rights” than those enjoyed by non-disabled children. For example, the IDEA confers upon disabled children the right to an annually reviewed “individualized education program,” prepared by the school district, the child’s teacher and parents, and, when possible, the disabled child himself or *579 herself. See 20 U.S.C. § 1401(a)(2), 1414(a)(5) (Supp.1996). The “stay-put” provision, discussed in Honig, represents another example of conferring special rights upon disabled children. The Honig holding and its rationale, at least implicitly, relies upon the basic premise that children with disabilities are to be treated differently than children without disabilities.
In one fell stroke, the majority alters IDEA by grafting onto its language an exception not provided by Congress for children with disabilities who have been expelled or suspended for misconduct unrelated to their disabilities, namely the cessation of educational services during the period of the suspension or expulsion. Until today’s decision, no such exception existed. In my view, if a state refuses to offer educational services to a disabled child due to that child’s conduct—regardless of whether that conduct is a manifestation of the child’s disability—then it has ceased to assure that child of “the right to a free appropriate public education.” Contrary to Virginia’s belief, the statute in no way indicates that a disabled child forfeits or waives that right when he or she misbehaves in a manner unrelated to his or her disability.
While remedial legislation should be construed broadly to effectuate its purpose, I recognize that the canon of construction does not allow a court to ignore the plain wording of the statute. In the instant case, however, the IDEA’S plain language leaves no room for exceptions of the kind that Virginia has asked us to read into it. The Act requires that participating states have “in effect a policy that assures all children with disabilities the right to a free appropriate public education.” Hence, the IDEA’S unqualified language is sufficiently clear to have enabled Virginia authorities to perceive that they would have to adjust their disciplinary policies for disabled students if they wished to participate in the IDEA-B program. Compare Timothy W. v. Rochester, New Hampshire, Sch. Dist., 875 F.2d 954, 960-61 (1st Cir.) (rejecting argument that, in order to demand educational services under IDEA, a child must show that he or she would benefit from such services; because the IDEA is unequivocal and “is permeated with the words ‘all [disabled] children’ ... the Act in its entirety makes clear that a ‘zero-reject’ policy is at the core of the Act”), cert. denied, 493 U.S. 983, 110 S.Ct. 519, 107 L.Ed.2d 520 (1989).
III.
Virginia’s proposed exception to the IDEA, sanctioned by the majority, has no support in the statutory language of the IDEA. Moreover, the exception the majority has placed its imprimatur on today is divorced from the very purposes of the IDEA. The majority has succumbed to the temptation which we as judges should steadfastly resist. We should read a statute as it is written, not rewrite it as we would like ■ it to be. It should be Congress not the courts to incorporate in the statute following “all children with disabilities” the phraseology: “excluding those expelled or suspended for misconduct unrelated to their disabilities.” The statute as it now stands should reach the conclusion that our legislators have viewed the situation in the round and have been concerned that growing up without any appropriate public education may well, indeed probably will, lead to grownups less able to live intelligently, or at least reasonably, and more prone to the improper conduct which had led to his or her expulsion' or suspension in the first place. In other words, an appropriate public education produces better citizens. Special classes other than those termed regular or, where most functional, resort to appropriate correspondence courses prepared by teachers and no doubt other techniques may be used to ensure an appropriate free public education for disabled children who have been expelled or suspended without adversely affecting the classes wherein expulsion or suspension of a handicapped student has occurred. Because I cannot sanction the undermining of the IDEA’S noble purposes by leaving 126 children with disabilities without any educational services during a period of expulsion or suspension, I dissent.

. Virginia does provide alternative educational services through various state and local programs to many non-disabled children who are expelled from school pursuant to the Comprehensive Services Act (CSA). Those services, however, are not appropriate for a disabled child, and to the extent that such services exist, the majority’s concern, undergirding its analysis, that Virginia will be burdened by requiring for disabled students, is dissipated greatly by Virginia's provisions of such services to non-disabled children. Furthermore, it should be obvious to all, and especially was to members of Congress, that education, though rarely through private tutors, will improve the.circumstances in which we all live especially if disabled children are not cut off from the considerable benefits of a public education.

. Precursor to Individuals with Disabilities Education Act (IDEA).

. The Court found, though, that the issue was moot as to one of the students. 484 U.S. at 317-18, 108 S.Ct. at 600-01.

. Judge Luttig’s panel dissent, adopted by the en banc court, notes that the Ninth Circuit's dicta was “notably left undisturbed by the Supreme Court in Honig." 86 F.3d at 1351. I find nothing notable about the Supreme Court’s failure to address a point appearing only as dicta. As Judge Luttig notes, the Honig decision did not address the issue before the court in the instant case; the Honig decision only addressed “whether ... state or local authorities may ... unilaterally exclude disabled children from the classroom for dangerous or disruptive conduct growing out of their disabilities.” Honig, 484 U.S. at 308, 108 S.Ct. at 596. In fact, no dispute exists that the two students expelled in Maher were expelled because of misbehavior related to their disabilities.

.Virginia relies upon Doe v. Board of Educ., 1996 WL 79411 (N.D.Ill. Feb. 16, 1996), presently pending before the Seventh Circuit, to support its position. In Doe, the district court held that "[t]he continued provision of educational services to a student who has been expelled for reasons unrelated to a disability is not expressly required by the IDEA or its regulations, nor is there any reason to believe that Congress intended to erect an impenetrable shield insulating students with disabilities from the consequences of misconduct totally unrelated to their disabilities.” However, the district court granted plaintiff's motion for reconsideration reasoning that the Office of Special Education Programs (OSEP) had taken a contrary position in an opinion letter and finding "that the positions taken by OSEP are entitled to deference”, mot. for recons, granted, 1996 WL 197690 (N.D.Ill. Apr. 22, 1996). Subsequently, the district court granted *576 defendant's motion for reconsideration concluding that upon further reflection, the OSEP opinion letter was interpretative, not legislative, and as such the court was not bound by OSEP letter, and thus, found that IDEA did not require the provision of educational services for a disabled child expelled or suspended for misconduct unrelated to his or her disability), mot. for recons, granted, 1996 WL 392160 (N.D.Ill. July 11, 1996); see also Doe v. Koger, 480 F.Supp. 225, 229 (N.D.Ind.1979) (stating that IDEA "only prohibits the expulsion of [disabled] children who are disruptive because of their [disability]”) (no determination had been made, however, as to whether misbehavior was related to disability).

. Mills v. Board of Educ. of District of Columbia, 348 F.Supp. 866 (D.D.C.1972), and Pennsylvania Ass’n for Retarded Children, et al. (PARC) v. Pennsylvania, 343 F.Supp. 279 (E.D.Pa.1972).

. A public education’s availability to all children, able and disabled alike, is obviously essential in the public's interest. That is as true or more true for disabled children, whether their violence is due to their disabilities or not. For disabled children, the statutory language pertains to "all" with no exceptions mentioned.